UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RICHARD J. AUTHER,                                    **DECISION AND ORDER**
and JENNIFER AUTHER,
                                                      09-CV-00527(A)(M)
                            Plaintiffs,
v.

OSHKOSH CORPORATION,

                            Defendant.
_____

        This action was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings [6], [95], p. 8.[1] Before me are the parties' renewed cross-motions [96, 97] to preclude expert testimony pursuant to Fed. R. Evid. ("Rule") 702.[2] For the following reasons, defendant Oshkosh Corporation's ("Oshkosh") motion is granted, and plaintiffs' motion is denied.[3]

**BACKGROUND**

        In this products liability action, plaintiff, Richard Auther, a United States Marine, seeks to recover damages for personal injuries which he allegedly sustained on August 23, 2007,

---

[1]     Bracketed references are to the CM/ECF docket entries.

[2]     Oshkosh's motion to preclude [47] was previously withdrawn during the pendency of its motion for summary judgment [58]. After that motion was denied [57, 70], Oshkosh renewed its motion to preclude [71] and plaintiffs filed their cross-motion to preclude [75]. The cross-motions were then withdrawn during the pendency of Oshkosh's motion to certify the order denying Oshkosh's summary judgment for an interlocutory appeal [94], and renewed following the denial of that motion [96, 97].

[3]     "A motion to disqualify a prospective testifying expert is non-dispositive in nature and subject to review as clearly erroneous or contrary to law." Dreyer v. Ryder Automotive Carrier Group, Inc., 2005 WL 1074320, *1 (W.D.N.Y.) (Foschio, M.J.), objections overruled, 367 F. Supp. 2d 413 (W.D.N.Y. 2005) (Arcara, J.).

while participating in United States Marine Corps training at Twentynine Palms Training Base in California, when he was struck by a rim that separated from a tire after the wheel assembly was ejected from a Medium Tactile Vehicle Replacement ("MTVR") truck manufactured by Oshkosh. Complaint [1], ¶3.[4] Plaintiffs allege that accident was caused by "brake drum and brake chamber diaphragm failures". Id. Plaintiffs have asserted claims against Oshkosh based on negligence and strict liability regarding the design and manufacture of the MTVR truck. In support of their claims, plaintiffs rely on their expert, Stanley L. Stokes, P.E., who opines in an August 30, 2010 report [47-2] that:

> "the Oshkosh MTVR vehicle involved in plaintiff's accident was defectively designed and unreasonably dangerous because the PVS brake diaphragm incorporated into the brake chamber could fail producing the leak causing the spring parking/emergency brakes to apply thereby generating tremendous heat and causing a catastrophic failure of the tire and resulting in the ejection of the tire and wheel assembly off the vehicle at a high rate of speed.
>
> It was foreseeable that injury could result from the failure of the PVS diaphragm." Id. at p. 6 of 7.

Among the materials which Stokes reviewed in preparing his report were several pre-accident reports prepared by Oshkosh and MGM Brakes addressing the initial PVS diaphragm failures and development of the replacement diaphragms. [47-2], p. 2. These reports include MGM Brakes' December 22, 2003 Engineering Test Report [75-4], which concluded that "[b]ecause of the common nature of the [PVS diaphragm] failure . . . development of a new PVS diaphragm material is underway" (id., Bates No. OSK000834) and Oshkosh's Engineering Technical Report, prepared in or about July 2004 [75-7], which tested the new PVS diaphragms.

---

[4] Familiarity with the complete facts of this case, which are set forth in my September 15, 2011 Report and Recommendation [57], is presumed.

Stokes reviewed post-accident reports, including a report [75-8] prepared in October 2007 by Oshkosh's representative, Andrew Theisen, which concluded that:

> "the following chain of events has been developed to explain the wheel separation. The brake chamber diaphragm developed a crack. The cracked diaphragm allowed an air leak that caused the service brake to apply. The dragging brake against the drum generated extreme heat. The heat conducted through the brake drum, wheel, and into the tire. The heating of the tire caused gases to be released from the rubber of the tire. As vehicle movement continued, the brake continued to heat. Eventually, the grease on the inner side of the hub ignited. This further added to the heat source affecting the tire. The gases inside the tire reached a critical temperature-pressure combination and auto-ignited. This caused the internal pressure to increase rapidly with explosive force. The wheel material was unable to withstand the excessive loading and yielded." Id., Bates No. OSK000008.

He also reviewed a December 3, 2007 Failure Analysis report [75-9] prepared by Chadwick Johnson, Oshkosh's Senior Materials and Process Engineer, which likewise concluded that "a significant amount of heat was generated in the wheel assembly prior to catastrophic failure. The wheel end most likely failed due to a combination of increased internal air pressure combined with reduction of material strength from the dragging brake heat source." Id., Bates No. OSK000013.

In support of its motion for summary judgment on its affirmative defenses that plaintiffs' claims are barred by the government contractor defense and by the superseding negligence of the government in failing to retrofit the subject vehicle (Oshkosh's Memorandum of Law [40-3], Points I and II), Oshkosh relied upon the affidavit and report of its expert, Alfred L. Cipriani, P.E., ACTAR [41-15], who opined to a reasonable degree of engineering and scientific certainty in a September 29, 2010 report that:

> "1. The manufacture of the MTVR was free from defects and was in accordance with the design specifications of the U.S. government.
>
> 2. The design of the MTVR brake system was not unique and, in fact, the fail safe aspect of the brakes is standard in the air-brake industry as well as specified in the contact documents.
>
> 3. Oshkosh exercised reasonable care in assisting the USMC with its investigation of the diaphragm cracking/splitting after they were advised of the cracking/splitting.
>
> 4. The decision to implement a retrofit program and how to implement the retrofit program were decisions made by the USMC, and Oshkosh acted reasonably in providing assistance at the request of the USMC.
>
> 5. The USMC was negligent in not following its own orders to retrofit the subject MTVR with the new diaphragm almost 3 years before the accident." [75-11], p. 6 of 10.

Oshkosh's motion for summary judgment having been denied, the parties now cross-move to preclude each others' experts from testifying at trial.

## ANALYSIS

**A.     The Standard for Admissibility of Expert Testimony**

"The Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702-it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (*quoting* Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)).

"In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e*., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. "Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered . . . . In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Id.

**B.     Oshkosh's Motion to Preclude Stanley Stokes from Testifying as an Expert**

Oshkosh argues that Stokes must be precluded from testifying as an expert because his opinions are neither reliable nor relevant. Oshkosh's Memorandum of Law [47-5], Points I and II. Turning first to the relevancy of Stokes' testimony, plaintiffs argue that his testimony is necessary "to explain how the tire and rim were ejected off of the vehicle". Plaintiffs' Memorandum of Law [77], p. 6 ("the plaintiff . . . requires expert testimony in order to be able to explain how the defective PVS brake diaphragm cause the accident"). However, Oshkosh does not dispute that the PVS diaphragm in the MTVR truck could (and did) fail (Oshkosh's Reply Memorandum of Law [82], p. 7; Oshkosh's Opposing Memorandum of Law [87], p. 10), and its own investigation concluded that "the root cause of the wheel separation was the split in the brake chamber diaphragm". Oshkosh's Reply Memorandum of Law [82], p. 4.

Since these issues are not in dispute, the jury does not need an expert's assistance in deciding them. *See* Goss v. JLG Industries, Inc., 2012 WL 268034, *9 (W.D.N.Y. 2012) (Skretny, J.) (precluding expert testimony that addressed, in part, matters already stipulated to by the defendant). To the extent that the jury requires an explanation of the mechanics by which the PVS diaphragm's failure caused the wheel assembly to be ejected, this is set forth in plain terms in Thiesen's October 2007 report. [75-8], Bates No. OSK000008.[5]

Moreover, plaintiffs' current explanation of the relevance of Stokes' testimony is difficult to reconcile with Stokes' own understanding of the opinion he rendered. Stokes testified that his opinion was limited to the design of the PVS diaphragm, and that his report contained no opinion as to the proximate cause of the accident. Stokes' deposition testimony [82-2], pp. 92, 96.

Even if Stokes' testimony could be considered relevant, his opinions are not reliable. In conducting the Daubert analysis, I "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).

Stokes conceded that he did nothing beyond reading the reports of Oshkosh and MGM Brakes in reaching the conclusions set forth in his report. Stokes' deposition testimony

---

[5] Oshkosh also argues that Stokes' testimony is not relevant since plaintiffs must establish that it designed and/or manufactured the PVS diaphragm, and Stokes did not (nor could) offer such an opinion (Oshkosh's Memorandum of Law [47-5], pp. 9-11; Oshkosh's Reply Memorandum of Law [82], p. 9).

[82-2], pp. 72-73.[6]  "While experts may rely upon and testify as to factual data obtained from others, their opinions should not be used as a basis for the witnesses' conclusions." United States v. 102.93 Acres of Land Situate in Town of Huntington, Suffolk, County, New York, 154 F.Supp. 258, 261 (E.D.N.Y. 1957), aff'd 257 F.2d 805 (2d Cir. 1958). "[I]n doing so, the expert witness must in the end be giving his *own* opinion". Malletier v. Dooney & Bourke, Inc., 525 F.Supp.2d 558, 664 -665 (S.D.N.Y. 2007) (emphasis in original). *See* In re Wagner, 2007 WL 966010, *4 (E.D.Pa. 2007) ("The Federal Rules of Evidence do not permit experts to simply 'parrot' the ideas of other experts or individuals"); Eberli v. Cirrus Design Corp., 615 F.Supp.2d 1357, 1364 (S.D.Fla. 2009) ("While it is true that 'an experts testimony may be formulated by the use of the facts, data and conclusions of other experts,' . . . , such expert must make some findings and not merely regurgitate another expert's opinion").

There is nothing to indicate that Stokes attempted to validate the conclusions reached by Oshkosh or MGM Brakes or drew upon their testing to reach *his own* conclusions. He lacked even basic knowledge of the MTVR truck, including its weight ([82-2], p. 56), maximum speed (id.), year of manufacture (id.), mileage of the subject vehicle (id., p. 73), number of axles, (id., pp. 56, 60-61), number of brake chambers (id., pp. 60-61), or how many other PVS diaphragms were on the vehicle. Id.  Indeed, when asked if he could describe the type of vehicle at issue, Stokes testified "[o]nly in a very general sense." Id., p. 56.

Stokes also lacked familiarity with the applicable safety codes and guidelines. Although Stokes was  a member of the Society of Automotive Engineers ("SAE") and

---

[6]  Stokes testified that the initial draft of his report was prepared, at his request and with his input, by plaintiffs' counsel, and that he edited that draft. Stokes' deposition testimony [82-2], pp. 6-9.

Technology Maintenance Council of the American Trucking Association, which each published codes and guidelines applicable to the brake system of the MTVR truck, he was unable to specifically identify the applicable codes and guidelines.  Id., pp. 39-42.  Of the codes and guidelines governing the braking system on the MTVR vehicle, Stokes was only able to identify the "basic one", Federal Motor Vehicle Safety Standard 121.  Id., pp. 35-36.

    Further, Stokes lacked familiarity with the PVS diaphragm, conceding that he did not examine any exemplar PVS diaphragms or the remaining PVS diaphragms on the subject vehicle (id., p. 66), performed no research to determine what SAE designation of NBR rubber was used in the failed diaphragm (id., pp. 62-63), did not know who manufactured the diaphragm (id., p. 93), did no testing on the diaphragm's rubber to determine its useful life, durability, or how it is affected by the environment (id., pp. 73-74), and did not even know what the acronym "PVS" stood for.  Id., p. 59.

    Significantly, Stokes was unable to identify what caused the diaphragm to fail, testifying only that he could "*infer* that it was due to a strength factor of the materials . . . since the material was changed." Id., p. 69 (emphasis added).  Even when asked how he knew the HNBR rubber used in the replacement diaphragm was of a higher strength, he testified "I have got to rely on [the testimony of Chris Pregger, a MGM Brakes' representative]", conceding that he performed no testing or research to determine the difference between the NBR and HNBR rubbers.  Id., pp. 74-75.  Having failed to conduct any testing, research, or examination to

validate his inference, Stokes' opinion appears to be drawn *entirely* from the conclusions of Oshkosh and MGM Brakes.[7]

In attempting to justify Stokes' failure to go beyond Oshkosh's and MGM Brakes' reports in formulating his opinion, plaintiffs argue that he "was prevented from conducting any testing, reconstruction or analysis on his own because the subject MTVR and the component parts placed in defendant's possession were disposed of by them." Plaintiffs' Memorandum of Law [77], p. 3.[8] However, as argued by Oshkosh, nothing precluded Stokes from examining the other diaphragms on the subject vehicle or exemplars of the original and redesigned diaphragms. Oshkosh's Memorandum of Law [47-5], p. 8. Nor does it excuse Stokes' failure to conduct any research.[9]

---

[7] This deficiency also further impairs the reliability of Stokes' testimony as the jury may just as easily infer from Oshkosh's and MGM Brakes' reports that the diaphragm failed because of the strength of the rubber used. *See* Eberli, 615 F.Supp.2d at 1364-65 ("The Court fails to see how Mr. Klepacki's opinion that the breather line did not freeze would assist the trier of fact, given that Dr. Butler made the flight test conclusions and Mr. Klepacki admitted that the flight test conclusions were the sole basis for his conclusion that the breather line did not freeze. In this instance, it appears that Mr. Klepacki made no findings regarding the breather line; instead, it appears that he simply adopted Dr. Butler's conclusions regarding the flight tests. Such a methodology surely does not satisfy the <u>Daubert</u> standards").

[8] In response to plaintiffs' March 11, 2010 notice to Oshkosh to preserve the failed brake diaphragm and other related components [75-12], it responded on April 16, 2010, that those items had been "disposed of in accordance with Oshkosh Corporation procedure" [75-13].

[9] *Compare with* Rodriguez v. General Dynamics Armament and Technical Products, Inc., 696 F.Supp.2d 1163, 1174 (D.Hawai'i), appeal dismissed, 627 F.3d 1259 (9th Cir. 2010) ("GDATP . . . argues that Nixon's opinions are not reliable because he did not perform any independent research, did not attempt to test his own theories, did not interview any witness, did not conduct an on-site investigation or go to the scene of the accident, did not examine the fragments collected after the explosion, and did not attempt to determine whether the Army has had similar malfunctions. <u>Daubert</u> does not require Nixon to do any of these things. Testing of the opinion of any expert in this case, peer review, or a calculation of error-rate are procedures all hampered by the destruction of the mortar in question. To complicate matters, the Army has exclusive possession of the remaining mortars. Under these circumstances, an expert may reasonably base an opinion regarding the cause of the premature explosion on theoretical possibilities or on previous experience with similar ammunition").

Therefore, Oshkosh's motion to preclude Stokes from testifying as an expert is granted.

C.  **Plaintiffs' Motion to Preclude Alfred Cipriani from Testifying as an Expert**

In support of their motion to preclude Alfred Cipriani from testifying as an expert on behalf of Oshkosh, plaintiffs argue that he "clearly relied upon the same factual information as [Stokes] in coming to his conclusions in this matter", and should be similarly precluded. Plaintiffs' Memorandum of Law [77], pp. 6-7. However, unlike Stokes, Cipriani opines on issues distinct from the conclusions reached in the pre- and post-accident reports prepared by Oshkosh and MGM Brakes. Thus, he could not have merely adopted his opinions from the conclusions reached by others. Moreover, Cipriani states that he "relied on more than just the reports of Oshkosh Corporation and MGM Brakes in order to render [his] conclusions in this matter" and "performed research outside of [his] review of the file materials in order to render [his] conclusions in this matter". Cipriani Affidavit [87-4], ¶¶10-11. Since plaintiffs failed to depose Cirpriani, I have no reason to doubt these representations.

Plaintiffs next argue that Cipriani lacks the necessary qualifications in the area of brake design to testify concerning these issues. Plaintiffs' Memorandum of Law [77], p. 7.[10] However, "the inquiry under F.R.E. 702 is whether the expert is generally qualified to render an

---

[10]  Although plaintiffs broadly argue that Cipriani should be precluded "based upon a lack of qualification and reliability or relevance" (Braun Affirmation [75], Wherefore Clause), they specifically raised only the two arguments which I have addressed.

opinion on the question at issue . . . not whether he is an expert in the general subject matter of the litigation. The fact that plaintiffs' expert may not have dealt before with the type of machinery involved is not dispositive." Colombo v. CMI Corp., 26 F. Supp. 2d 574, 576 (W.D.N.Y. 1998) (Larimer, J.).

As a registered professional engineer, who has had training on brake design, operation, and performance (Cipriani Affidavit [87-4], ¶6), as well as practical experience in the operation, repair and maintenance of braking systems on USMC trucks (id., ¶7), I have no reason to conclude that he lacks the necessary qualifications to render the opinions he did. Indeed, since 1980 Cipriani has consulted on between six and 12 brake related cases per year. Id., ¶8. Therefore, plaintiffs' motion to preclude Cipriani from testifying as an expert is denied.

## CONCLUSION

For these reasons, Oshkosh's motion [96] to preclude Stanley Stokes from testifying as an expert is granted, and plaintiffs' motion [97] to preclude Alfred Cipriani from testifying as an expert is denied. The parties shall contact Judge Arcara's chambers by September 30, 2013 to schedule a trial date.

**SO ORDERED.**

Dated: September 16, 2013

                                        <u>Jeremiah J. McCarthy</u>
                                        JEREMIAH J. MCCARTHY
                                        United States Magistrate Judge